# United States District Court
# District of Massachusetts

HIAWATHA KING,
      Plaintiff,

    v.                    CIVIL ACTION NO. 11-11709-RBC[1]

COMMISSIONER OF
      SOCIAL SECURITY,
          Defendant.

## *MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE (#15) AND DEFENDANT'S MOTION FOR JUDGMENT AFFIRMING THE COMMISSIONER'S DECISION (#16)*

COLLINGS, U.S.M.J.

### I. Introduction

On September 29, 2011, the plaintiff, Hiawatha King ("King"), filed a complaint (#1) against the defendant, the Commissioner of the Social Security

---

[1] With the parties' consent in January, 2012, this case has been reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 29 U.S.C. § 636(c).

Administration[2] ("the Commissioner").  King alleges that he has been adversely affected by the defendant's decision denying, in part, his application for disability benefits.  On February 16, 2012, an answer to the complaint (#12) was filed and, on the following day, the administrative record of the social security proceedings (#12) was submitted.

In accordance with the parties' briefing schedule, on April 15, 2012, the plaintiff filed a motion (#15) for an Order reversing the decision of the Commissioner which incorporated a memorandum of law.  Thereafter on May 31, 2012, the Commissioner filed a motion (#16) for an Order affirming the decision of the Commissioner, together with a separate memorandum of law (#17).  Two weeks later on June 14, 2012, King filed a response (#18) to the Commissioner's submissions.

At this juncture, the record is complete and the cross-motions stand ready for decision.

## II. Procedural Background

On March 19, 2010, the plaintiff filed applications for disability insurance

---

2

On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration.

benefits and social security income. (TR[3] at 8, 25, 88-89, 154-167)   These applications were initially denied approximately three months later on June 25, 2010, and again upon reconsideration on October 5, 2010. (TR 25, 94-97, 100-105)  King then submitted a request for a hearing before an administrative law judge ("ALJ") on December 1, 2010; the hearing was subsequently held on March 1, 2011. (TR at 25, 42-86, 111-112)  The plaintiff attended the hearing, accompanied by his attorney. (TR at 42)   King testified at the administrative hearing, as did a vocational expert. (TR at 52-72, 75-82)  On April 21, 2011, the ALJ rendered a partially favorable decision, finding that King was disabled from November 10, 2009 to February 23, 2011, but that the plaintiff's disability ended on February 24, 2011. (TR at 25-41)

The plaintiff's claim was selected for review by the Decision Review Board. (TR at 20)   On May 22, 2011, King was notified that consequent to recent rule changes, review of his claim had been transferred to the Appeals Council. (TR at 14)  By letter dated July 21, 2011, plaintiff's counsel submitted written arguments to the Appeals Council on King's behalf. (TR at 261-261)  On September 1, 2011, the Appeals Council denied the plaintiff's request for

---

[3]

The designation "TR" refers to the administrative record, #12.

review. (TR at 1-6)  The Appeals Council's action had the effect of establishing the ALJ's decision as the final decision of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

### III. The Facts

King had a right total knee arthroplasty on February 23, 2010. (TR at 300-302)  On July 23, 2010, the plaintiff had a second knee operation, this time a right knee closed manipulation under anesthesia. (TR at 443-444)  King's medical record reflects that at an office visit to the Whittier Street Health Center on September 14, 2010, his musculoskeletal gait and station were noted to be normal, and he could "undergo exercise testing and/or participate in exercise program." (TR at 507)

The plaintiff's September 15, 2010 physical therapy progress note indicates that King reported his knee pain to be a three on a scale of ten. (TR at 510)  The physical therapy progress note two days later shows a pain rating of zero on a scale of ten when King had taken pain medication prior to the appointment. (TR at 511)  The plaintiff also related that the pain could still increase to an eight on a scale of ten, but not as often. (TR at 511)  Regarding other pain comments, the physical therapy progress note states:

4

> Patient reports over the past month has been feeling improvements.    Patient reports that when leaves therapy feels great and no longer needs to take bus can walk and feels better with this and feels increase motion and strength.  Patient reports still has pain at night but not as bad, maximum is 4/10.

TR at 511.

A September 22, 2010 physical therapy progress note relates that King walked to the appointment and, although he reportedly was "a little tired," his knee was feeling better with his pain being a three out of ten. (TR at 513)

A Physical Residual Functional Capacity Assessment ("RFC") of the plaintiff was completed on September 27, 2010 by Phyllis Sandell, M.D., a medical consultant, after reviewing King's medical records.[4] Dr. Sandell opined that with respect to exertional limitations, the plaintiff could occasionally lift and/or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk (with normal breaks) at least 2 hours in an 8-hour workday; sit (with normal breaks) about 6 hours in an 8-hour workday; and push and/or pull limited in lower extremities. (TR at 464)   These conclusions were supported by the fact that, post his two knee surgeries, the plaintiff was "expected to improve but

---

[4]

    Another RFC was completed by Mary Connelly, M.D., on June 10, 2010. This RFC was similar to that completed by Dr. Sandell, but it pre-dated the plaintiff's second knee surgery. (TR at 421-428)

sedentary restrictions may still apply at end of year." (TR at 464)  Dr. Sandell was further of the view that King could climb, balance, stoop, kneel, crouch and crawl occasionally.  (TR at 465)   The plaintiff was found to have no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. (TR at 466-467)

According to a September 29, 2010 physical therapy progress note, King "report[ed] yesterday [he] was doing laundry and had to go up and down 3 flights [of] stairs several times carrying heavy loads and is sore on knee from this and pain is 5/10." (TR at 515) At a follow-up office visit at the Whittier Street Health Center on September 30, 2010, the plaintiff reported that he was not in pain and had no concerns. (TR at 484)

Although the plaintiff reported "having a little more soreness and pain and is 6/10" on October 1, 2010, he "continue[d] to progress with range of motions and strength" and "demonstrate[d] increase[d] strength with step down." (TR at 517)  Similarly, King's pain was reported to be a six out of ten in an October 6, 2010 physical therapy progress note and he "continue[d] to progress well with hip strength/vmo strengthening exercises." (TR at 517-518) With pain in his right knee rated a five out of ten on October 8, 2010, the plaintiff "continue[d] to progress well with strengthening adding side lunges

6

with gliders today." (TR at 519)  The October 14, 2010 Physical Therapy Re-evaluation indicates the plaintiff's pain level was a three out of ten and, although King had been sick and not able to exercise much, he reported that his "knee has been feeling better." (TR at 520)  The assessment at that point was as follows:

> Patient continues to make progress towards all goals. Patient demonstrates continued increase right knee flexion range of motion, LE strength and balance/proprioception.  Patient would benefit from one more month of therapy to progress knee range of motion, strength/balance and continue to increase tolerance to all daily activities.

TR at 521.

On October 15, 2010, King underwent a well visit physical examination at the Whittier Street Health Center. (TR at 478-481)  The plaintiff reported no concerns and no pain; he denied any joint pain, joint swelling, or muscle weakness or stiffness. (TR at 478-479)  King's gait and station were reported to be normal, and he was cleared to participate in an exercise program. (TR at 480)

The physical therapy progress note dated October 20, 2010 reflects that the plaintiff "report[ed] that [he] has been doing a lot of yardwork over the past few days and has been a little sore from this and pain is 4/10." (TR at 523)

7

Similarly on October 28, 2010, the physical therapy progress note states that King "report[ed] [he] was doing yardwork today for a job and was kneeling for many hours and is sore from this but was able to do it and currently pain is 5/10." (TR at 524)  The physical therapist's assessment that date was that the plaintiff "continue[d] to have increase tolerance to daily activities including walking, stairs, kneeling, squatting." (TR at 525)

Although King reported pain "and a feeling of leg giving out 2 times with unknown etiology" on November 1, 2010, during physical therapy he did not experience any increased pain or instability and he tolerated the exercises well. (TR at 526)  On November 8, 2010, the physical therapy progress note reflects that the plaintiff had called his doctor due to increased knee pain, but was waiting for an appointment until mid-December. (TR at 527)  King reported his pain to be a six out of ten. (TR at 527)  He "present[ed] with decrease[d] weight bearing with ambulation in clinic and after exercise was able to tolerate increase [in] weight bearing and increase [in] knee range of motion." (TR at 528)  On November 11, 2010, the plaintiff reported that he was feeling much better than earlier in the week with his pain being a five out of ten. (TR at 528)  Six days later King "report[ed] no new c/o and pain is 4-5/10." (TR at 530)  On his last day of physical therapy on November 19, 2010, the plaintiff related that

8

he was experiencing decreasing pain and "overall [was] feeling much better and knee [was] bending more and [felt] stronger and able to perform daily and work activities." (TR at 531)

The plaintiff had a follow-up appointment with his surgeon, Jeffrey Zarin, M.D., on December 15, 2010. (TR at 534-535) According to the medical record, King

> ambulates independently with no assistive devices and at low level of functioning does not have significant pain in his knee.   However, [he] has significant discomfort with attempted flexion of the knee.  He says he has a sense of instability when he is standing and he has aching after he stands for a long period of time.

TR at 534.

Dr. Zarin found the plaintiff's situation to be complex and discussed various options with the him, including the fact that King met "radiographic and clinical indications for surgical intervention." (TR at 534)  Dr. Zarin's report indicates that the plaintiff chose "to continue with the knee support at this

point to see if the knee will calm down as he is not having severe pain and can live with the amount of motion he has." (TR at 534)

9

On February 23, 2011, the plaintiff had another follow-up visit with Dr.

Zarin. (TR at 536-537)  The medical record reflects that King

> says overall the pain in his knee is not too bad and he
> says that he has pain only two days a week or so.  He
> says occasionally he has significant sense of instability
> but it is not common and is not limiting to him.  He
> does not work as a chef, however, because if he stands
> for a long period of time he has discomfort.

TR at 536.

Dr. Zarin found that the plaintiff had a "decrease in the synovitis today and his

leg overall is improved." (TR at 536)  With respect to assessment and plan, Dr.

Zarin wrote:

> The different options were discussed with the patient.
> This is a complex situation given the instability in mid
> flexion and extension but tight flexion gap.  I think
> most likely the only surgical option to address this will
> be a true revision surgery with removal and
> replacement of all the parts and converting it to a semi-
> constrained implant....Currently the patient at this
> point does not want to go ahead with surgical
> intervention....the patient wants to wait and continue
> with using a knee support and his pain medicines.  I
> will see him back in about three or four months for
> repeat clinical evaluation and to make a decision.

TR at 536.

There are no further medical treatment records subsequent to Dr. Zarin's

February 23, 2011 note.  At the hearing before the ALJ, plaintiff's counsel stated

10

that Dr. Zarin declined to provide a medical source statement in support of King's disability claim. (TR at 73)[5]

## IV. The Standard Of Review

Title 42 U.S.C. §405(g) provides, in relevant part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive....

The Court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

> We must uphold a denial of social security disability benefits unless 'the Secretary has committed a legal or factual error in evaluating a particular claim.' *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S.Ct. 2248,

---

[5]

    In her decision, the ALJ noted that King had "a history of atypical chest pain" and "right shoulder pain," but that "[a]s the claimant's atypical cardiac chest pain and right shoulder condition with pain pose functional limitations that are no more than mild, [she found] these to be non-severe impairments." (TR at 31)  The plaintiff does not take issue with this finding or conclusion.

2254, 104 L.Ed.2d 941 (1989). The Secretary's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. §405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

*Manso-Pizarro v. Secretary of Health and Human Services*, 76 F.3d 15, 16 (1 Cir., 1996)(per curiam); *see also Reyes Roble v. Finch*, 409 F.2d 84, 86 (1 Cir., 1969)("And as to the scope of court review, 'substantial evidence' is a stringent limitation.").

The Supreme Court has defined "substantial evidence" to mean "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Irlanda Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1 Cir., 1991). It has been explained that:

> 'In reviewing the record for substantial evidence, we are to keep in mind that "issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary." The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.'

*Lizotte v. Secretary of Health and Human Services*, 654 F.2d 127, 128 (1 Cir., 1981)(quoting *Rodriguez v. Secretary of Health and Human Services*, 647 F.2d 218, 222 (1 Cir., 1981)); *Geoffroy v. Secretary of Health and Human Services*, 663 F.2d 315, 319 (1 Cir., 1981)("In any event, whatever label the parties or the court ascribe to the procedure used to review the Secretary's decision, statute and long established case law make clear that the court's function is a narrow one limited to determining whether there is substantial evidence to support the Secretary's findings and whether the decision conformed to statutory requirements." (citations omitted)).

In other words, if supported by substantial evidence, the Commissioner's decision must be upheld even if the evidence could also arguably admit to a different interpretation and result. *Ward v. Commissioner of Social Security,* 211 F.3d 652, 655 (1 Cir., 2000); *see also Nguyen v. Chater,* 172 F.3d 31, 35 (1 Cir., 1999) (per curiam).  Lastly,

> Even in the presence of substantial evidence, however, the Court may review conclusions of law, *Slessinger v. Sec'y of Health & Human Servs.*, 835 F.2d 937, 939 (1st Cir.1987) (per curiam)(citing *Thompson v. Harris*, 504 F. Supp. 653, 654 [D. Mass. 1980] ), and invalidate findings of fact that are 'derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts,' *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999) (per curiam).

*Musto v. Halter*, 135 F. Supp.2d 220, 225 (D. Mass., 2001).

## V. Discussion

The plaintiff challenges only part of the Commissioner's decision, that

being the ALJ's conclusion that King showed medical improvement as of February 24, 2011 such that he was no longer disabled. (#15 at 4)  King's arguments shall be addressed, seriatim.

In reaching the conclusion that the plaintiff had medical improvement as of February 24, 2011, the ALJ is said to have erred in impermissibly interpreting Dr. Zarin's treatment notes.  It is argued that "the ALJ both ignored critical aspects of Dr. Zarin's treatment notes and failed to obtain expert assistance in interpreting the medical relevance of his opinions with respect to the issue of medical improvement." (#15 at 5)

The ALJ plainly did not ignore Dr. Zarin's treatment notes.  To the contrary, in her decision the ALJ wrote:

> Based upon Dr. Zarin's findings in February of 2011, the claimant reported that his pain overall was not too bad and that he had pain only two days a week or so. The claimant reported that he occasionally had a significant sense of instability but it was not common and was not limiting to him. On physical examination, range of motion was from zero to ninety degrees that was an improvement. In extension and mid flexion, the claimant has varus/valgus laxity of the knee.  This did cause some discomfort to his knee but was reasonably well tolerated.  He had a decrease in synovitis and his leg overall was improved.

TR at 34.

King takes umbrage at the fact that the ALJ did not mention what is purported

to be Dr. Zarin's "actual conclusion" about the plaintiff's condition, to wit:

> This is a complex situation given the instability in mid
> flexion and extension but tight flexion gap. I think
> most likely the only surgical option to address this will
> be a true revision surgery with removal and
> replacement of all the parts and converting it to a semi-
> constrained implant....Currently the patient at this
> point does not want to go ahead with surgical
> intervention....the patient wants to wait and continue
> with using a knee support and his pain medicines. I
> will see him back in about three or four months for
> repeat clinical evaluation and to make a decision.

TR at 536.

However, as Dr. Zarin's treatment note indicates, the doctor discussed "[t]he

different options" with the plaintiff, one of which was a true revision surgery.

(TR at 536)   Another option was the one the plaintiff chose, "to wait and

continue with using a knee support and his pain medicines." (TR at 536)  The

plaintiff is misreading the record when he argues "that the only treatment

option available is removal and replacement of Mr. King's prior total knee

replacement, i.e., additional major surgery." (#15 at 6)  That may be the only

surgical option, but it was not the sole treatment option according to the

medical record.

In general, "[u]se of a medical advisor in appropriate cases is a matter left

15

to the Secretary's discretion; nothing in the Act or regulations requires it." *Rodriguez Pagan v. Secretary of Health and Human Services*, 819 F.2d 1, 5 (1 Cir., 1987)(citation omitted), *cert. denied*, 484 U.S. 1012 (1988). In this instance the ALJ was well able to evaluate Dr. Zarin's medical treatment notes. While it is true that Dr. Zarin described the plaintiff's knee as presenting "a complex situation," the text of the doctor's reports was not of such a highly technical nature nor did they contain "raw, uninterpreted clinical data," *Evangelista v. Secretary of Health and Human Services*, 826 F.2d 136, 144 (1 Cir., 1987), that a medical expert was required to interpret them. For example, a lay person could readily understand the statements that the plaintiff "says overall the pain in his knee is not too bad and he says that he has pain only two days a week or so" or that "[h]e says occasionally he has significant sense of instability but it is not common and is not limiting to him. He does not work as a chef, however, because if he stands for a long period of time he has discomfort" or that "his leg overall is improved." (TR at 536) In short, Dr. Zarin's medical reports were amenable to lay interpretation, and the ALJ did not err in failing to seek the assistance of a medical expert.

King next asserts that the RFCs of the state agency non-examining

physicians cannot constitute substantial evidence to support the ALJ's opinion because they are based on an incomplete record. The ALJ was entitled to consider state agency, non-examining sources as part of the record as a whole in making her decision. It is true that both of the RFCs were completed prior to final visits with Dr. Zarin in December 2010 and February 2011, respectively. However, both agency doctors anticipated that the plaintiff would improve post his knee surgeries (TR at 422, 464) and, in fact, the physical therapy progress notes and Dr. Zarin's medical records reflect just such an improvement.

This case is distinguishable from the First Circuit case upon which the plaintiff relies, *Alcantara v. Astrue*, 257 Fed. Appx. 333, 2007 WL 4328148 (1 Cir. Dec. 12, 2007) (per curiam) (unpublished). In *Alcantara*, the ALJ discounted the concurring opinions of the claimant's treating psychiatrist, her therapist and two consultants in favor of the opinion of a reviewing, non-examining psychologist who "considered no more than the first third of the record for the period of alleged disability [and whose] opinion was irrelevant to most of the disability period." *Alcantara*, 257 Fed. Appx. at 334, 2007 WL 4328148, at *1. Moreover, the reviewing, non-examining psychologist upon whose opinion the ALJ relied did not review any "reports from therapists or

treating psychiatrists for the period of alleged disability." *Alcantara*, 257 Fed. Appx. at 334, 2007 WL 4328148, at *1.  Further, the First Circuit noted that "[t]he record repeatedly indicated that the appellant deteriorated with her parents' deaths." *Alcantara*, 257 Fed. Appx. at 334, 2007 WL 4328148, at *1.

Here, Dr. Sandell's RFC was completed subsequent to King's two knee surgeries during the time he was still undergoing physical therapy.  Dr. Sandell noted the plaintiff's then recent second surgery of closed manipulation, and stated "[h]e is expected to improve and sedentary restrictions may still apply at end of year." (TR at 464)  A review of the physical therapy progress notes as well as Dr. Zarin's final two medical reports confirm that the plaintiff did feel better by the end of 2010 going into the beginning of 2011. (*See, e.g.*, TR at 520 "knee has been feeling better"; TR at 531 "overall [was] feeling much better and knee [was] bending more and [felt] stronger and able to perform daily and work activities"; TR at 536 "says overall the pain in his knee is not too bad and he says that he has pain only two days a week or so.") In addition, unlike *Alcantara*, the ALJ in this case "grant[ed] significant weight to the opinion/conclusions of Dr. Zarins (sic)." (TR at 35)

To summarize, the ALJ could properly rely on the RFCs in the record, and

those RFCs provide substantial evidence to support the ALJ's decision.

King contends that the ALJ did not properly assess his credibility. The applicable standard bears repetition: "It is the responsibility of the Secretary to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the Secretary, not the courts." *Irlanda Ortiz*, 955 F.2d at 769 (citations omitted). "The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." *Frustaglia v. Secretary of Health and Human Services*, 829 F.2d 192, 195 (1 Cir., 1987).

In her decision, the ALJ reviewed the medical evidence in detail and at length. (TR at 30-31) The ALJ also considered the plaintiff's testimony:

> At the hearing, the claimant testified he had undergone open knee replacement after which he received physical therapy. The claimant could be required to undergo additional arthroplasty. He used a cane for longer walks and stated that it was hard to move around. He explained that he was in recovery for abusing alcohol and had gone to detoxification. He explained that he had been sober since February of 2011. He was attending a computer class through Boston Career Link two times a week. He lived on the third floor of a house that had no elevator. He came to his hearing by using the subway. He liked to play

> video games.  He was taking Vicodin.  He would go to visit his fiancé and used public transportation to get there.   He read AA or NA manuals to help him maintain sobriety.  He would go out to eat if he felt well enough.  He remarked that if he were to sit too long, his leg would stiffen up.  He could walk one mile without stopping and could sit for one to one and a half hours before having to get up and stretch.  He explained that if Vicodin were not strong enough, he would take Percocet.

TR at 31.

The ALJ thoroughly examined the medical records, the treatment records, the RFCs and the plaintiff's activities.  She credited the RFCs and Dr. Zarin's reports.  It was well within the ALJ's purview to reject any of King's complaints to the extent they exceeded the medical evidence.

Although King argues that the ALJ did not apply the factors set forth in *Avery v. Secretary of Health & Human Services*, 797 F.2d 19, 29 (1 Cir., 1986), the ALJ's inquiry at the hearing and her decision make clear that she did. *Dorego v. Astrue,* 2012 WL 603196, at *15 (D. Mass., Feb. 24, 2012) ("An ALJ must consider each of the *Avery* Factors, and here the combination of the ALJ's decision and the questions she asked the claimant during the administrative hearing demonstrate that she did so. While the ALJ's decision did not address medication side effects, the First Circuit has established no requirement that an

ALJ expressly address each factor in her written decision. *See Shields v. Astrue*, 2011 WL 1233105, at *11 (D. Mass. March 30, 2011)("[T]here is no requirement that [the ALJ] make specific findings regarding each of the [*Avery*] factors in his written decision."); *Graham v. Barnhart*, 2006 WL 1236837, at *8 (D. N.H. May 9, 2006)("an ALJ complies with *Avery* if he explores the factors at the administrative hearing"); *Braley v. Barnhart*, 2005 WL 1353371, at *6 (D. Me. June 7, 2005) (claimant "points to no First Circuit authority for the proposition that an administrative law judge must slavishly discuss each *Avery* factor, and I find none.")").

In sum, substantial evidence in the record supports the ALJ's assessment of the plaintiff's credibility.   In these circumstances, it is not in the Court's province to interfere with the ALJ's judgment.

The plaintiff argues that the vocational expert's testimony does not accurately reflect the medical record and, consequently, cannot constitute substantial evidence to support the ALJ's finding at Step 5 of the standard five-step evaluation process.  This is so, according to King, because "the ALJ's RFC hypothetical was fundamentally flawed. The hypothetical question posed to the VE was based on the RFC assessments of the state agency non-examining

physicians." (#15 at 12-13) Since the Court has found the ALJ's reliance on the RFCs to have been proper, this argument is not persuasive.

There is an attempt to color the ALJ's treatment of the RFCs as being inconsistent since she found the plaintiff under a disability from November 10, 2009 through February 23, 2011, but then not disabled beginning on February 24, 2011 based on the same RFCs.  The difference, of course, is that the ALJ factored in the vocational expert's testimony to the effect that if an individual exceeded the customary limits of one unexcused or unscheduled absence per month, that would eliminate work in the competitive workplace. (TR at 33, 82) The record reflects that during the period the plaintiff was undergoing physical therapy, he plainly would have had more than one absence per month from work.  Moreover, at the time of his last visit to Dr. Zarin on February 24, 2011, King had completed his physical therapy and the doctor found that he had improved overall, the pain in his knee was "not too bad," and he had pain only two days per week. (TR at 536)  In short, the ALJ did not reject the RFCs on one hand and then accept them on another.   Rather, the ALJ weighed and considered all of the evidence, including the change in the plaintiff's circumstances over time.  There is no error.

Lastly it is argued that the ALJ erred because she failed to provide notice

to the plaintiff that she intended to take testimony from the vocational expert via telephone during the administrative hearing. (TR at 123-137)  Indeed, the record reflects that the vocational expert was expected to appear and give testimony in person. (TR at 138)  The plaintiff interposed an objection to taking the testimony telephonically at the hearing. (TR at 46, 76)  King claims that this failure to give notice is an infringement of his constitutional due process rights.

Some courts have found that the failure to give notice that an expert would be testifying by telephone constituted legal error requiring remand because it violates SSA regulations.[6] *See Koutrakos v. Astrue*, 2012 WL 1283427, **5-7 (D. Conn.   Jan. 9, 2012)(collecting cases at n. 15), *Report and Recommendation adopted by* 2012 WL 1247263 (D. Conn. Apr. 13, 2012). Other courts have found the practice, although troubling, to be harmless error, depending on the circumstances of the case.  *See Tardiff v. Astrue*, 2012 WL

---

[6] The Court noted that "the ALJ's decision to allow the vocational expert to testify telephonically may not amount to a due process violation." *Koutrakos v. Astrue*, 2012 WL 1283427, at *7 (D. Conn. Jan. 9, 2012), *Report and Recommendation adopted by* 2012 WL 1247263 (D. Conn. Apr. 13, 2012).  The Eight Circuit has reached a similar conclusion. *Hepp v. Astrue*, 511 F.3d 798, 806 (8 Cir., 2008) ("due process under the Fifth Amendment does not require in-person cross-examination in social security disability hearings, and the ALJ did not violate Hepp's due process rights by refusing to require Dr. Blankenship to appear in person.").

777484, **5-7 (D. N.H. Mar. 7, 2012)("this district has not adopted a rule that telephonic testimony cannot be used in a social security hearing when the applicant objects. Instead, this court will consider the circumstances to determine whether telephonic testimony prejudices the claimant.); *Goodwin v. Astrue*, 2011 WL 1630927, at *11 (D. N.H. Apr. 11, 2011)("Goodwin objects to the ALJ's admission of telephonic testimony...If required to decide the issue, the court would disagree, on grounds that: (1) Goodwin did not raise a contemporaneous objection to the disputed manner of testimony; (2) he has not indicated how he was prejudiced by the admission of telephonic testimony from Dr. Axline; (3) the regulations on which Goodwin relies, 20 C.F.R. §§ 404.936(c) and 404.950(a), do not disallow telephonic testimony, which means that the Social Security Hearings, Appeals and Litigation Law Manual, which does allow such testimony, does not conflict with the regulations; (4) the court of appeals for this circuit has never barred telephonic testimony by medical experts in Social Security administrative hearings; and (5) while not addressing the regulatory issue, the Eighth Circuit has held that an ALJ's receipt of telephonic testimony from a consultative examining physician does not violate a social security claimant's right to due process, *see Hepp v. Astrue*, 511 F.3d

798, 805–06 (8th Cir.2008)."), *Report and Recommendation adopted by* 2011 WL 1630282 (D. N.H. Apr. 29, 2011) ; *Palaschak v. Astrue*, 2009 WL 6315324, at **9-12 (N.D. N.Y. Nov. 18, 2009), *Report and Recommendation adopted by* 2010 WL 1257895 (N.D. N.Y. Mar. 26, 2010).

In this case the plaintiff finds himself in something of a conundrum.  The ALJ determined the plaintiff to be under a disability from November 10, 2009 through February 23, 2011 in part "[b]ased on the testimony of the vocational expert," yet King does not appeal that portion of the decision.   While King claims he was prejudiced by the telephonic testimony, he only challenges the vocational expert's testimony when it cuts against him, i.e., as of February 24, 2011.   Even then, there is no indication how the challenge to the testimony would have been any different had the witness appeared in person.[7]   In other words, there is no claim of specific prejudice on the facts of this case.

In these circumstances, and after a review of the entire record, the Court finds any claim of prejudice based upon the taking of telephonic expert testimony to be unavailing, and any error to be harmless.

### VI. Conclusion and Order

---

[7] It is noted that King's counsel did not ask any questions on cross-examination of the expert. (TR at 82)

For all the reasons stated, it is ORDERED that Plaintiff's Motion To Reverse (#15) be, and the same hereby is, DENIED.  It is FURTHER ORDERED that Defendant's Motion For Judgment Affirming The Commissioner's Decision (#16) be, and the same hereby is, ALLOWED.  Final Judgment shall enter for the defendant.

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
March 28, 2013.          United States Magistrate Judge